IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VEE'S MARKETING, INC.,

                Plaintiff,

        v.

UNITED STATES OF AMERICA,

                Defendant.

OPINION AND ORDER

13-cv-481-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      After a profitable year of brokering onions through his Subchapter S corporation, plaintiff Vee's Marketing, Inc., Scott Vee faced a sizable tax bill for the 2004 tax year. A salesman representing CJA and Associates suggested he could reduce his tax burden by setting aside money in CJA's Affiliated Employers Health & Welfare Trust, which CJA marketed as a 10-or-more multiple employer welfare benefit fund. The salesman told Scott Vee that plaintiff's payments into the fund would reduce the amount of Vee's income subject to taxes and provide him term insurance plus a paid up $1,000,000 of life insurance that could, if Vee wished, be used upon retirement for reimbursement of medical expenses. Vee enrolled plaintiff in the plan.

      Over the next eight years, plaintiff  made contributions to the plan that reduced Scott Vee's taxable income. Neither plaintiff nor Scott Vee ever filed a Form 8886, reporting plaintiff's participation in the plan, although such a form is to be filed by

anyone participating in a "reportable transaction," that is, a transaction "that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service (IRS) has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction."  26 C.F.R. § 1.6011-4(b)(2).  In November 2011, defendant determined that plaintiff was required to file such a form and assessed it $10,000 penalties for each of the tax years 2004-07under 26 U.S.C. § 6707A, which imposes penalties on persons who fail to include information on their returns "with respect to a reportable transaction."  Plaintiff paid the penalties and filed a claim for refund of the penalty amounts.  When defendant did not act on the claim within six months, plaintiff brought this suit seeking a tax refund under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422(a), as it was entitled to do.

In an earlier order, dkt. #44, I found that defendant had the authority to require disclosure of such transactions by plaintiff because it had filed Notice 95-34, which both identified the arrangement at issue as a "tax avoidance transaction" and a "listed transaction" or "reportable transaction" and described the "tax consequence or tax strategy" of the arrangement.  Opin. & Order, dkt. #44, at 6.  The only remaining question remaining for trial was whether plaintiff could show that CJA's Affiliated Employers Health & Welfare Trust in which it participated is not the same or substantially similar to the arrangement described in in Notice 95-34, in which case plaintiff would not have been required to file a Form 8886 disclosure statement in compliance with 26 C.F.R. § 1.6011-4(d).  From the evidence adduced at trial, I find that

plaintiff did not make this showing.  Accordingly, its claim for refund will be denied.

FINDINGS OF FACT

A. CJA and Associates

1. Marketing

CJA marketed its Affiliated Employers Health & Welfare Trust to insurance agents, lawyers and accountants through webinars, in-person meetings, newsletters, brochures and Power Point presentations.  During all times relevant to this case, CJA marketed the tax deductibility of contributions to the Trust.

The Plan and those marketing it emphasized ways in which individuals participating in the Trust could gain access to their accounts while they were still alive. Even after the written Plan was amended to remove medical reimbursement accounts as an option, CJA continued to market their availability.  E.g., Mar. 2004 CJA News & Views, tr. exh. #154;, PREPare employee benefit plan presentation, prepared for Scott A. Bramming, and dated November 2, 2004, tr. exh. #185 (listing amount of post-retirement medical reimbursement benefits to be expected, id. at 9, and stating that "all qualified reimbursement expenses are distributed income tax free," id. at 1).  In a sample plan brochure that appears to have been prepared in 2008, a CJA employee listed the projected value of a settlement for an employee who chose to obtain a lump-sum settlement of her guaranteed paid up post-retirement death benefit.  Tr. exh. #148.013. In a 2005 illustration prepared for an employer contemplating joining the Trust, CJA

3

represented that the participant could exchange a portion of her benefit for cash during her lifetime and that the payments were flexible:  a participant could choose income stream, single lump sum payment or payment on an as-needed basis.  Tr. exh. #151.019.  On several occasions, CJA employees have tried to help participants find buyers for their paid-up death benefits.  Tr. exhs. ##157, 159.

In January 2004, CJA's president and CEO, Raymond Ankner, wrote to one William Fox, explaining that CJA provided a fully paid-up certificate of life insurance to participating employees when they reached retirement age.  Tr. exh. #136.  With the certificate, a participant could make an irrevocable assignment of the beneficiary and, by doing so, move the insurance out of his estate; alternatively, he could sell the death benefit to a willing beneficiary or convert the certificate in whole or in part to a health reimbursement benefit.  Ankner emphasized that "[t]he right to sell a death benefit is available as is the right to sell any asset."  Id.  (Ankner is also president of Actuarial Administrators, Inc., which has no employees of its own, but uses CJA employees to provide administrative services to the Plan.)  In an email dated January 31, 2008, Ankner wrote that if "JD" were to join the Plan, JD would be the beneficial owner of the paid-up contract and could add it to his estate planning trusts, sell the contract for cash or trade it for medical benefits.  Tr. exh. #156.

2. Operation of trust

CJA's Affiliated Employers Health & Welfare Trust owned the insurance contracts

4

used to fund the Trust's death benefits.  From 2004-07, the Trust included more than ten employers who made contributions.  As of December 6, 2010, plaintiff was one of more than 50 employers who were making contributions to the Trust.

When CJA set up the Affiliated Employer Health & Welfare Trust, it chose to maintain each participant's account independently of the account of any other participant.  CJA's vice president and general counsel, Jeffrey Bleiweis, testified that "anytime money was transmitted to the insurance company, the insurance company required us to tell it who it was for, otherwise, the insurance company wouldn't know what to do with it."  Tr. trans., 1-62-1-63.  CJA maintained records of the contributions by each employer to the Trust , id. at 1-64-1-65, and handled each participant's payments separately from those of any other participant.

At some point before plaintiff joined the CJA Plan, the Trust owned an insurance product issued by Baltimore Life Insurance Company.  In 2003, after Baltimore Life terminated CJA's marketing agreement for its products, CJA procured an insurance contract from MONY Life Insurance to provide benefits under the Plan.  MONY marketed the contract to CJA as a lifetime group insurance contract that was intended to accomplish the goal of a pre-retirement death benefit and a paid-up post-retirement death benefit.

In effect, the MONY policy operated as a universal life insurance policy, as MONY confirmed when it told CJA that it had created a group term insurance "by using a group universal life chassis."  Tr. exh. #110.  The product had all the elements of such a policy:

5

the ability to identify mortality charges separately, accommodate flexible premium payments, accumulate the portion of the contribution that was not going toward mortality charges and accommodate that portion as accumulated interest.  Tr. trans. 2-61, tr. exh. #60.

In 2008, MONY Life terminated CJA's marketing agreement, which meant that CJA could no longer use MONY's "lifetime group product" to provide benefits to new employers joining the plan.  CJA then entered into a marketing agreement with Fidelity Security Life Insurance to use its group term product called Optima, which Fidelity described as a "universal life contract split into it's [sic] two parts," tr. exh. #146.004, and which showed an adjustable rate term as well as an accumulation account.

At any given time while the Affiliated Employers Health & Welfare Trust held funds at MONY Life for Trust participants, CJA's employees could obtain the current reserve value for any particular participant from MONY Life.  For example, on December 7, 2006, a CJA employee emailed a MONY Life employee, asking for the current value of coverage for a particular employee, tr. exh. # 204; on December 6, 2013, a CJA employee emailed a MONY Life employee to ask about cash surrender values of paid-up policies for three separate paid-up policies, adding, "Please note that this is coverage between 3 separate groups (CAID Solutions, LLC, MRM Management, Inc. and Quality Medical Systems, Inc.)."  Tr. exh. #204.  In 2014, a CJA employee emailed MONY Life inquiring about the cash surrender value of a policy issued to a Mitch Freeman.  Tr. exh. #208.  After the Trust switched to Fidelity Security, CJA employees could obtain the

6

same information from the new company about coverage for any particular participant.

### B. Vee's Marketing and Scott Vee

#### 1. Plaintiff's decision to join Affiliated Employers Health & Welfare Trust

Plaintiff Vee's Marketing, Inc. is a corporation whose business is the brokerage of fresh onions. It operates as a Subchapter C corporation, which means that any profits it earns are treated as those of its sole employee, Scott Vee (the company's chief executive officer and head salesman), to be reported on Scott Vee's individual tax returns.

In 2004, Scott Vee learned of a plan offered by CJA and Associates, marketed as a 10-or-more employer plan that was tax exempt under 26 U.S.C. § 419(f)(6), which meant that all contributions to the trust were fully tax-deductible in the year in which they were paid. The salesman told Scott Vee that his company's entire first year contribution was deductible, that this and succeeding contributions would be used to purchase pre-and post-retirement insurance benefits or paid-up medical benefits after he retired. When the salesman mailed Scott Vee's participation documents to CJA on December 15, 2004, the Joinder Agreement showed checked boxes for pre-retirement benefit, post-retirement death benefit and post-retirement medical expense, all in the amount of $1,000,000. Tr. exh. #22.0018. The paid-up medical benefits were the primary reason Vee had his company joined the plan, but he did not notice when he signed the actual plan that it contained no provision for such benefits. It was Scott Vee's understanding that all of plaintiff's contributions to the plan would be used by the Trust

for his benefit and not for the benefit of any other participant.  It was important to him that he would be able to have the full value of his contributions when he turned 65.

When plaintiff submitted its initial payment to CJA, CJA sent the money to Fifth Third Bank, with instructions for applying the funds for the benefit of Scott Vee.  Tr. exh. #22.0016.  The money then went to MONY Life, which issued a certificate, numbered BT0211, identifying the insured person as Scott Vee and the owner as the Trust.  Tr. exhs. ##51, 250.

On February 14, 2008, MONY Life took $1710 out of plaintiff's accumulation account for Scott Vee to pay premiums due on his term life insurance, tr. exh. #38; this withdrawal had no economic effect on any other employee participating in the Trust.  In 2011, MONY Life's internal accounting provided the itemized plaintiff's total payments for Scott Vee's group term premium and accumulation reserve as of 2011.  Tr. exh. #30.

Plaintiff never attached Form 8886 to its returns or sent the form to the IRS Office of Tax Shelter Analysis.  Until late 2011 or early 2012, Scott Vee had never heard of IRS Form 8886.


2. Plaintiff's contributions

Plaintiff made its first contribution to theTrust in December 2004, in the amount of $145,000, plus $1250 for fees.  CJA used $5400 of the contribution to pay for one year of term insurance on Scott Vee's life; the remainder went into an account (referred to as "the accumulation account") to fund Scott Vee's pre- and post-retirement death benefit.

8

Plaintiff identified the contributions it made to the Trust for 2004 as retirement expenses for Scott Vee; the payments had the effect of reducing Scott Vee's taxable income for that year.  For each of the tax years 2005-07, plaintiff made a contribution in the amount of $20,750.  In total, for the years 2004-07, plaintiff contributed $227,250 to the Trust and deducted that amount from its business income as contributions to the Trust, reducing Scott Vee's taxable income.  Plaintiff made additional contributions to the Trust in 2009 and 2010.  In August 2011, Scott Vee notified CJA that plaintiff would make no further contributions.  Plaintiff's contributions to the Trust never exceeded 10% of the total contributions of all employers in the Plan in any of the years at issue (2004-07).

When MONY Life terminated its marketing agreement with CJA, the decision did not affect policies it had already issued, including the term policy covering Scott Vee. Nevertheless, on December 5, 2008, a CJA employee wrote to MONY Life on Actuarial Administrators letterhead, enclosing a partial surrender form, asking it to process a partial surrender of Vee's accumulation account and return $165,905.70.  Tr. exh. #68.  On the same day, the Plan (also through Actuarial Administrators) wrote Scott Vee to recommend that he move his reserve assets in the accumulation account to Fidelity and sent along an actuarial evaluation of his account.   Tr. exh. #37.   Scott Vee executed a partial surrender of the account, which amounted to $167,000.

On February 11, 2009, CJA wrote to Fidelity, enclosing  a check for $190,000, with directions to treat $12,440 as a regular contribution, $178,313 as a one-time contribution and send all commissions to CJA.   Tr. exh. #89.  (Although the letter did

not say so, $25,000 of the $190,000 represented an additional contribution of $25,000 by plaintiff.)  According to the letter to Fidelity, the $190,000 was to be deposited in Scott Vee's account and not in the account of any other participant.  After transfer of the accumulation account to Fidelity, CJA continued to transmit plaintiff's group term premium to MONY Life, which still held Scott Vee's renewable term life insurance.  Tr. exh. #179.

The contributions made by plaintiff on behalf of Scott Vee were available to pay his term insurance premium in 2008, when he did not submit a cash payment for the premium.  Although the policy provided that there would be no partial surrenders from the group term life insurance, a partial surrender could be made from the accumulation account for the benefit of the participant to whom the account was linked; it could not be used to pay for someone else's term premium.   MONY Life's product specifications, tr. exh. #60, p. 3, tr. trans. 2-63-2-67.  CJA maintained the same arrangements when it changed to Fidelity Security.

OPINION

The only question remaining for resolution is whether plaintiff has proved that the CJA Plan in which it participated is not the same or substantially similar to the arrangement described in Notice 95-34.  Plaintiff bears the burden of proof on this point because it is seeking a refund of the penalties it has paid in order to contest the validity of the IRS's assessment of penalties.  330 West Hubbard Restaurant Corp. v. United

States, 203 F.3d 990, 995 (7th Cir. 2000) ("in tax refund case, the IRS's tax assessment is presumed correct")(citing Welch v. Helvering, 290 U.S. 111, 115 (1933)); Matter of Carlson, 126 F.3d 915, 921 (7th Cir. 1997) ("Generally the taxpayer bears the burden of proof when disputing tax liabilities with the IRS.").

As the IRS explains in Notice 95-34, it published the notice after becoming aware that promoters were offering trust arrangements purporting to satisfy the requirements for a 10-or-more employer welfare benefit fund exemption from income tax under 26 U.S.C. § 419A(f)(6), but falling short of the requirements for exemption under the statute. The Notice was intended "to alert taxpayers and their representatives to some of the significant tax problems that may be raised by these arrangements." Id. It warned of two factors that would prevent contributions to such arrangements from qualifying for tax exemption: contributions in excess of 10 percent of the total contributions by a single employer in the multi-employer group and experience rating with respect to individual employers. Notice 95-34. In this case, neither side introduced any evidence that plaintiff contributed more than 10 percent of the total contributions in the Affiliated Employers Health & Welfare Trust. Defendant introduced ample evidence of "experience rating with respect to individual employers," that is, maintaining separate accounting for individual participants. Plaintiff produced no evidence to rebut the showing.

The Notice identified warning signs that should suggest caution to any employer considering involvement in an employer trust. It read in part as follows:

> These arrangements typically are invested in variable life or universal life insurance contracts on the lives of the covered employees, but require large

11

employer contributions relative to the cost of the amount of term insurance that would be required to provide the death benefits under the arrangement. The trust owns the insurance contracts. The trust administrator may obtain the cash to pay benefits, other than death benefits, by such means as cashing in or withdrawing the cash value of the insurance policies. Although, in some plans, benefits may appear to be contingent on the occurrence of unanticipated future events, in reality, most participants and their beneficiaries will receive their benefits.

The trusts often maintain separate accounting of the assets attributable to the contributions made by each subscribing employer. Benefits are sometimes related to the amounts allocated to the employees of the participant's employer. For example, severance and disability benefits may be subject to reduction if the assets derived from an employer's contributions are insufficient to fund all benefits promised to that employer's employees. In other cases, an employer's contributions are related to the claims experience of its employees. Thus, pursuant to formal or informal arrangements or practices, a particular employer's contributions or its employees' benefits may be determined in a way that insulates the employer to a significant extent from the experience of other subscribing employers.

A close look at the Affiliated Employers Health & Welfare Trust shows that it only purported to operate as a 10-or-more employer welfare benefit fund exempt from income tax, when it clearly exhibited each of the warning signs identified by the IRS.

To begin, the contributions of participants in the Trust were *"typically invested in variable life or universal life insurance contracts."* Both the MONY Life and the Fidelity Security insurance contracts were universal life insurance contracts, that is, insurance contracts in which the term insurance element is separate from the savings element and the premiums are flexible, so that in any given year, the cost of the premium may be paid out of savings, depending on the earnings in that account. These policies accumulated a reserve, as Scott Vee's did; they had flexible payments; and they were described by the

12

issuers as universal life insurance policies.

Participation in the plan "*require[d] large employer contributions relative to the cost of the amount of term insurance that would be required to provide the death benefits under the arrangement.*" Plaintiff's first year contribution to the CJA Plan was $165,000, which was far in excess of the $5400 cost of term insurance for the first year.

"*The trust own[ed] the insurance contracts.*" In this case, the Trust owned the insurance contracts paid for by participants in the Plan.

The trust administrator (CJA) could "*obtain the cash to pay benefits, other than death benefits, by such means as cashing in or withdrawing the cash value of the insurance policies.*" As the evidence at trial showed, the Trust, acting through CJA, withdrew cash from Scott Vee's accumulation account on at least four occasions. It withdrew cash from Scott Vee's accumulation account at MONY Life to pay Vee's term insurance premiums in 2008; it withdrew approximately $165,000 from Vee's accumulation account at MONY to fund a new accumulation account at Fidelity Security; and it paid Vee $400,000 as a settlement for his claims against CJA. When marketing the Trust, CJA touted the ability of participants to withdraw funds before death, such as through viatical settlements that CJA would help arrange. (A viatical settlement is "an agreement by which the owner of a life insurance policy that covers a person (as the owner) who has a catastrophic or life-threatening illness receives compensation for less than the expected death benefit of the policy in return for a turning over (as by sale or bequest) of the death benefit or ownership of the policy to the other party (as a company specializing in such transfers)."

13

M-W.com (visited May 20, 2015).)

"*Although in some cases, benefits may appear to be contingent on the occurrence of unanticipated future events, in reality, most participants and their beneficiaries will receive their benefits.*" To receive the value of his life insurance policy, Scott Vee did not have to die before his normal retirement age or become disabled; he was assured of receiving the value of his million dollar life insurance policy so long as his premiums were paid.  Plaintiff never introduced any evidence to indicate that any participant in the Trust did not receive the benefits for which the participant had paid.

"*The trusts often maintain separate accounting of the assets attributable to the contributions made by each subscribing employer.*"  Defendant introduced extensive evidence of CJA's ability to learn the balance of any subscribing employer; plaintiff introduced no evidence to rebut this evidence or to suggest that the trust was not set up to segregate the accounts of individual employers (or of the individual employees of the same employer.).

"*Benefits are sometimes related to the amounts allocated to the employees of the participant's employer.*"  The CJA Plan was set up to achieve this purpose: the benefits were designed to relate exactly to the amounts allocated to the employees of the participant's employer.

In short, the trial evidence showed that CJA's Affiliated Employers Health & Welfare Trust was an aggregation of separate plans maintained for individual employers that were experience-rated with respect to individual employers, that is, they were structured so as to assure each employer that its contributions would benefit only its own employees.  The money that participating employers paid into the Plan bought insurance

14

for only their own employees; there was no pooled risk.

I conclude that plaintiff has failed to show that the Affiliated Employers Health & Welfare Trust in which it participated was not the same or substantially similar to the arrangement described in Notice 95-34.


ORDER

IT IS ORDERED that plaintiff Vee's Marketing, Inc.'s claim brought under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422(a) for refund of the $40,000 of payments made for its failure to file Form 8886 with the Internal Revenue Service in the tax years 2004-07 is DENIED.  The clerk of court shall enter judgment for defendant Internal Revenue Service and close this case.

Entered this 21st day of May, 2015.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge

15